No. 25-2239

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

_____

EYAL YAKOBY, JORDAN DAVIS, NOAH RUBIN AND
STUDENTS AGAINST ANTISEMITISM, INC.,

*Plaintiffs-Appellants*,

v.

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 2:23-cv-04789-KNS

_____

**BRIEF OF AMICI CURIAE
CENTER FOR CONSTITUTIONAL RIGHTS AND PALESTINE LEGAL
IN SUPPORT OF DEFENDANT-APPELLEE**

**Center for Constitutional Rights**
Maria LaHood
Baher Azmy
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

**Palestine Legal**
Radhika Sainath
Sabiya Ahamed
55 Exchange Place, Suite No. 402
New York, NY 10005
(312) 964-2667

*Attorneys for Amici Curiae*

## Table of Contents

INTERESTS OF AMICI CURIAE..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ...................................................................................7

I. Because Plaintiffs Challenge What is Properly Construed as Political Speech, Not Conduct Targeting Students on the Basis of their Jewish Identity, Title VI Does Not Afford Them Relief ........................................................7

    A. The Acts Plaintiffs Challenge Did Not Target Them on the Basis of a Protected Characteristic .............................................................9

    B. The Specific Political Expression Alleged by Plaintiffs Cannot Form the Basis of a Hostile Environment Claim ...........................................11

    C. The Antisemitism Definition Advocated for by Plaintiffs Violates the First Amendment ......................................................................17

II. The Particular Slogans and Protests Plaintiffs Challenge Reflect Political Commitments Rooted in Principles of Justice and Struggle, Not Anti-Jewish Animus ....................................................................................18

    A. Slogans Speaking Favorably of "Intifada" are Protected Political Speech ..19

    B. "From the River to the Sea" is Protected Political Speech..........................21

    C. Slogans with the word "Martyr" and/or Expressing Favor for Hamas are Protected Speech.....................................................................23

    D. "Free Palestine," "Free Gaza," and Cursing the Israeli Army Is Protected Political Speech ......................................................................24

    E. The Freedom School for Palestine Is Protected Political Speech .................25

III. Plaintiffs' Demands of the University Potentially Create a Hostile Environment for Palestinian Students in Violation of Title VI ...............................26

CONCLUSION ...............................................................................27

**Table of Authorities**

**Cases**

*Bermudez v. Muhlenberg Hosp. Ctr.*, CIVIL ACTION NO. 99-4091, 2000 U.S. Dist. LEXIS 15174 (E.D. Pa. Oct. 18, 2000) ........................................................9

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)..........................................................24

*Cohen v. California*, 403 U.S. 15 (1971) ..............................................................25

*Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13 (1st Cir. 1989) ........................9

*Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d. 1160 (N.D. Cal. 2024)3

*Felber v. Yudof*, 851 F. Supp. 2d 1182 (N.D. Cal. 2011) ................................. 15, 24

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art,* 2025 U.S. Dist. LEXIS 33977 (S.D.N.Y. Feb. 25, 2025) ................................................................16

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025)........................................................................................5, 20

*Hayut v. State Univ. of N.Y.*, 352 F.3d 733 (2d Cir. 2003) .......................................9

*Landau v. Corporation of Haverford College*, 780 F. Supp. 3d 548 (E.D. Pa. 2025) ............................................................................................................ 14, 25

*Newman v. Point Park Univ.*, No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722 (W.D. Pa. Mar. 31, 2022) ............................................................... 9, 14, 15

*Rodriguez v. Maricopa Community College,* 605 F.3d 703 (9th Cir. 2009) ...........16

*Segev v. President and Fellows of Harvard College*, No. 1:25-cv-12020 (D. Mass. Dec. 4, 2025) ............................................................................ 10, 18, 22

*Snyder v. Phelps,* 562 U.S. 443 (2011)......................................................... 22, 25

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1 (1st Cir. 2025) ................................................................................................... passim

*Texas v. Johnson*, 491 U.S. 397 (1989) ................................................................11

*Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist. LEXIS 178359 (D. Md. Oct. 1, 2024)..... .................................................................................................... 2, 22, 24

*Yates v. United States*, 354 U.S. 298 (1957)...........................................24

**Statutes**

42 U.S.C. § 2000d ....................................................................................9

**Other Authorities**

Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (S. Afr. v. Isr.), Provisional Measures Order, 2024 I.C.J. Rep. 3, ¶ 54 (Jan. 26, 2024) ...................................................................................3

Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 HARV.L.REV.1 (2025) ................................. 13, 20

Indep. Int'l Comm'n of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel, Rep. of the Human Rights Council, *Legal Analysis of the Conduct in Gaza Pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, U.N. Doc. A/HRC/60/CRP.3 (Sep. 16, 2025) ....................................................................................................3

**INTERESTS OF AMICI CURIAE**

The Center for Constitutional Rights ("CCR") is a non-profit legal advocacy organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international human rights law. Founded in 1966 by attorneys supporting civil rights activists in the South, CCR has long worked with oppressed communities seeking justice and liberation, including by litigating cases to protect their First Amendment rights, such as *Texas v. Johnson*, 491 U.S. 397 (1989) and *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). CCR has represented numerous individuals and organizations facing suppression of their advocacy for Palestinian rights. *See, e.g.*, *Salaita v. Kennedy*, 118 F. Supp. 3d 1068 (N.D. Ill. 2015); *Keren Kayemeth LeIsrael - Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 713 (2024); *Bronner v. Am. Studies Ass'n*, No. 2019 CA 001712 B (D.C. Super. Ct. Mar. 1, 2023); *Khalil v. Trump*, 784 F. Supp. 3d 705 (D.N.J. 2025).

Palestine Legal (a project of Tides Center) is a non-profit legal and advocacy organization dedicated to protecting the civil and constitutional rights of people in the U.S. who speak out for Palestinian freedom. Palestine Legal tracks incidents of censorship and efforts to suppress expression supporting Palestinian rights, including through the misuse of Title VI of the Civil Rights Act of 1964. Palestine Legal has represented hundreds of students at universities across the country

engaging in the speech activity at issue in this litigation and has successfully defended the First Amendment rights of students protesting Israel's treatment of Palestinians. *See, e.g.*, *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist. LEXIS 178359 (D. Md. Oct. 1, 2024).

Amici submit this brief to argue that an educational institution does not violate Title VI of the Civil Rights Act of 1964 where the charging allegations pertain to protected political speech on a matter of public concern. In particular, Amici urge this Court to reject Plaintiffs-Appellants' ("Plaintiffs") demand that it adopt a highly contested and overbroad definition of antisemitism in support of their Title VI claim, as accepting such a definition would run afoul of elementary First Amendment principles and would aid in the broader, unconstitutional project of silencing pro-Palestinian advocacy.[1]

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Over the past two years, tens of thousands of students from universities across the United States have engaged in protests, sit-ins, marches, and encampments on the conviction that Israel is committing, and the United States is supporting, a

---

[1]     Plaintiffs-Appellants have consented to the filing of this Amicus brief. Defendant-Appellee takes no position. No party or party's counsel authored this brief in whole or in part, and no person or entity contributed money to fund the preparation or submission of this brief, other than Amici and their counsel. No disclosure statement is required by Fed. R. App. P. 26.1 or 3d Cir. L.A.R. 26.1.0.

genocide in Gaza, a position supported by international bodies,[2] human rights organizations,[3] and even a U.S. district court.[4] At the University of Pennsylvania (Penn), students have been advocating for Palestinians' right to exist free from apartheid, genocide, and other violations of international law and are doing so in a manner that echoes past movements for social justice throughout history, from the Civil Rights Movement to opposition to the Vietnam War to the struggle against

[2] Indep. Int'l Comm'n of Inquiry on the Occupied Palestinian Territory, including East Jerusalem, and Israel, Rep. of the Human Rights Council, *Legal Analysis of the Conduct in Gaza Pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, U.N. Doc. A/HRC/60/CRP.3 (Sep. 16, 2025), https://www.un.org/unispal/wp-content/uploads/2025/09/a-hrc-60-crp-3.pdf (concluding that Israel is responsible for committing genocide); Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (S. Afr. v. Isr.), Provisional Measures Order, 2024 I.C.J. Rep. 3, ¶ 54 (Jan. 26, 2024) (International Court of Justice (ICJ) found that Israel's assault on the Palestinian people in Gaza plausibly constitutes genocide), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf.
[3] B'Tselem, *Our Genocide* (July 2025), https://www.btselem.org/sites/default/files/publications/202507_our_genocide_eng.pdf; Physicians for Human Rights Israel, *Destruction of Conditions of Life: A Health Analysis of the Gaza Genocide* (July 2025), https://www.phr.org.il/wp-content/uploads/2025/07/Genocide-in-Gaza-PHRI-English.pdf; Amnesty International, *'You Feel Like You Are Subhuman': Israel's Genocide Against Palestinians in Gaza*, Index. No. MDE 15/8668/2024 (Dec. 4, 2024), https://www.amnesty.org/en/documents/mde15/8668/2024/en/.
[4] *Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d. 1160, 1163, 1167 (N.D. Cal. 2024), *aff'd,* 107 F.4th 926 (9th Cir. 2024) (dismissed on jurisdictional grounds) (describing "the ongoing military siege in Gaza [as] intended to eradicate a whole people and therefore plausibly fall[ing] within the international prohibition against genocide," and "implor[ing] Defendants [U.S. officials Biden, Blinken, and Austin] to examine the results of their unflagging support of the military siege against the Palestinians in Gaza," and stating that "[i]t is every individual's obligation to confront the current siege in Gaza.").

3

South African apartheid. During the Civil Rights Movement, Black Americans and their allies engaged in similar protests demanding justice and equal rights.[5] Today's movement for Palestinian rights is likewise supported by non-Palestinian allies, including a significant number of Jewish students, Jewish faculty, and Jewish organizations.[6] The advocacy that Plaintiffs claim is antisemitic reflects universal political commitments rooted in international law, justice, and equality for all—not anti-Jewish animus.

Groups and students opposed to this advocacy for Palestinians have filed at least 28 lawsuits since October 2023 urging courts to rule that speech advocating Palestinian rights violates Title VI and to force universities to respond by censoring and punishing such speech.[7] In doing so, they have relied on the highly contested definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA").[8]

---

[5] *See The White Southerners Who Fought US Segregation*, BBC (Mar. 12, 2019), https://www.bbc.com/news/world-us-canada-47477354.

[6] *See* Peter Beinart, *Trump Doesn't Want to Protect All Jewish Students—Just Those on His Team*, N.Y. TIMES (Apr. 28, 2025), https://www.nytimes.com/2025/04/28/opinion/jewish-student-protesters-gaza.html.

[7] *See generally* American Association of University Professors and the Middle East Studies Association, *Discriminating Against Dissent: The Weaponization of Civil Rights Law to Repress Campus Speech on Palestine* (Nov. 5, 2025), https://www.aaup.org/sites/default/files/2025-11/Discriminating-Against-Dissent_0.pdf at 18-20.

[8] *Id*.

Advocacy for Palestinian rights, including zealous criticism of Israel and its policies, is constitutionally protected political speech that does not target members of a protected group based on a protected category. Such advocacy cannot ground a hostile environment claim merely because some students disagree with, are offended by, or feel isolated by the viewpoints expressed. Title VI does not and cannot require universities to suppress criticism of a state merely because some members of a protected group regard that criticism as hateful. Doing so would run afoul of the First Amendment and "cast significant doubt on the statute's constitutionality." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 264 (S.D.N.Y. 2025) (citing *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)).

The District Court correctly observed that the "sweeping allegations of ideological, philosophical, religious and political concerns and grievances" of Plaintiffs 111-page Amended Complaint "have nothing to do with a federal lawsuit." Appendix 1 (Appx1). The charges in the complaint were so unmoored, the District Court puzzled as to "why Plaintiffs' counsel deemed it necessary to allege so many unrelated facts when doing so is directly contrary to federal pleading requirements." *Id*. The answer is short and dangerous: under the IHRA definition of antisemitism which Plaintiffs urge this court to adopt (Joint Appendix 49-51 ¶¶ 25-27), nearly any speech or expression that criticizes Israel or supports Palestinian rights would create a hostile environment for Jewish students. But labeling criticism of Israel as nearly

per se antisemitism does not make it so, any more than it would be an act of anti-Hindu discrimination to protest India's human rights violations in Kashmir, anti-Russian discrimination to protest Russia's invasion of Ukraine, or Islamophobic to criticize Saudia Arabia's human rights violations. The proposed definition is not descriptive, it is political—and thus it is being wielded as the tool of a censor. *See StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 17 (1st Cir. 2025) (declining to equate antizionism with antisemitism and "interpret Title VI as arming either side of that debate with the powers of a censor"). If Penn were to adopt IHRA and the other measures Plaintiffs demand to censor Palestinian students and their supporters, it would not only run afoul of the First Amendment, it would also risk violating the Title VI rights of Palestinian students on campus by discriminating against them.

Amici urge the Court to affirm the District Court's decision and to make clear that the vast majority of the examples in paragraphs 58 to 264 of the Amended Complaint are protected speech, while confirming that IHRA cannot be used to sustain a hostile environment finding, as it would render such a Title VI case inconsistent with the First Amendment.

# ARGUMENT

## I. Because Plaintiffs Challenge What is Properly Construed as Political Speech, Not Conduct Targeting Students on the Basis of their Jewish Identity, Title VI Does Not Afford Them Relief

Plaintiffs dedicate over 200 paragraphs of their Amended Complaint to incidents of alleged antisemitism, the vast majority of which are instances of speech in support of Palestinians, critical of Israel, or not sufficiently pro-Israel, and which was directed at the campus community or the public. JA62-134 ¶ 58-264. Plaintiffs argue the District Court erred in finding that Penn was not deliberately indifferent to this speech, which they contend reflects anti-Jewish animus. Plaintiffs' Opening Brief (Pls.' Br.) at 7-16.

The alleged discriminatory speech includes: student protestors' chants of "From the River to the Sea, Palestine Will Be Free" (JA100 ¶ 170); chants with the word "intifada" (*Id.*; JA125 ¶ 243); protests organized by a student group that opposes Israel's illegal occupation of Palestine (*Id.*); expressing disapproval at posting posters of Israeli hostages (JA99-100 ¶ 168-169); expressing a political opinion in favor of Hamas (JA90 ¶ 135); chanting from "water to water, Palestine will be Arab" (JA116 ¶ 214); using a slogan referring to "martyrs" (JA116 ¶ 214); the words "Free Gaza," "Intifada," "Fuck the IDF," or just the word "Shame" "plastered" on buildings (JA116 ¶ 214); chanting "every time the media lies, a neighborhood in Gaza dies" (JA106-7 ¶ 189); graffiti of "Free Palestine" or "Avenge

Gaza" on a library or "Blood $" on a bank (JA116 ¶ 214); a professor referring to the wall Israel has constructed in the West Bank as the "apartheid wall" in class (JA72-73 ¶ 89); a sit-in against Israel's genocide of Palestinians (JA112-113 ¶ 204); the words "Israel Commits Genocide" written in chalk (JA112 ¶ 202); a light show with the words "Zionism is Racism" and "Let Gaza Live" (JA112 ¶ 202); a "study-in" to raise awareness about Israel's targeting of educators in Gaza (JA124-5 ¶ 239); a walkout "to protest the ethnic cleansing of Palestinians in Gaza and [to] stand in solidarity with Palestine" (JA100 ¶ 170); a rally where a speaker expressed they wanted to "see a full and completely liberated Palestine From the River to the Sea" (JA125-6 ¶ 243); hosting the Palestine Writes Literature Festival which featured speakers who previously made statements such as Israel "[is] a racist, Jewish supremacist, settler-colonial regime of hell" (JA77-79 ¶ 98-99); screening a movie critical of the Israeli army (JA79 ¶ 100); discussing literature by a Palestinian novelist who was the member of a resistance group in the 1970s (JA79 ¶ 101)—*and more.*

Plaintiffs maintain that all of this political expression is actionable under Title VI. But Title VI only prohibits targeting on the basis of a protected characteristic, and does not and cannot require schools to censor political speech on an issue of public concern, even if offensive to some. The vast majority of the allegations in the Amended Complaint involve expression that does not target Plaintiffs (or anyone)

on the basis of a protected identity and describe First Amendment-protected speech (rallies, protest, sit-ins, slogans, chants, debates, events, movies, leaflets, speeches) on issues of public concern (Israel and Palestine) directed at the campus community rather than an individual or particular group. *See, e.g.*, *StandWithUs*, 158 F.4th at 5-10.

### A. The Acts Plaintiffs Challenge Did Not Target Them on the Basis of a Protected Characteristic

In order to establish a hostile environment claim under Title VI, the acts at issue must target a protected class, based on race, color, or national origin. 42 U.S.C. § 2000d; *Bermudez v. Muhlenberg Hosp. Ctr.*, CIVIL ACTION NO. 99-4091, 2000 U.S. Dist. LEXIS 15174 at *8-9 (E.D. Pa. Oct. 18, 2000); *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 22 (1st Cir. 1989) (overruled on other grounds) (Title VI complaint "must adequately allege discrimination based on a protected category); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 748 (2d Cir. 2003) (harassment must be motivated, at least in part, by a protected characteristic).

In hostile environment claims that have been brought to challenge advocacy in support of Palestinians, several courts have examined, as a threshold matter, whether the alleged conduct was motivated, at least in part, by a plaintiff's protected characteristic. For example, in *Newman v. Point Park Univ.*, No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722, *76, *89 (W.D. Pa. Mar. 31, 2022), the court found

that plaintiff failed to allege she suffered "severe or pervasive discrimination *on the basis of* her race/national origin or religion" [emphasis included] and that there were no allegations that pro-Palestinian students or professors "held their viewpoints on these contentious issues to cause hostility directed toward Plaintiff or had and advocated discriminatory views to harm Plaintiff specifically." *See also Segev v. President and Fellows of Harvard College*, No. 1:25-cv-12020, ECF No. 35 (D. Mass. Dec. 4, 2025) (finding that Plaintiff failed the first prong of the deliberate indifference test under Title VI because "[h]e has not shown that he experienced severe and pervasive *racial* harassment." [emphasis included]); *StandWithUs*, 158 F.4th at 18 (rejecting "plaintiffs' claimed right to stifle anti-Zionist speech by labeling it inherently antisemitic."); *Gartenburg*, 765 F. Supp. 3d at 270-273 (court began its analysis by noting the complaint "offers no factual support for its assertion that any of these messages were intended to target particular Jewish students, as opposed to efforts to communicate a political message to the [university] community at large.").

Here, the bulk of allegations that the Amended Complaint relies on to support a Title VI claim are not targeting Jewish students on campus because of their Jewish identity, let alone targeting the plaintiffs in this action on such grounds. Instead, the speech at issue—in the form of rallies, flyers, speeches, sit-ins and protests listed in

the complaint and engaged in by a substantial number of Jewish students as well[9]—makes political demands of the Israeli and U.S. government and the University about state and university practices; those demands are not grounded in animus towards Israelis, much less Jewish people, but are grounded in international law and justice for Palestinians. References to Judaism or Jewish identity were nowhere at issue. Even if Plaintiffs felt offended by the content of heated protest language, the First Amendment cannot relent to a subjective harm of an individual who—unlike the Jewish individuals participating in the protests—takes these political pronouncements personally. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

**B. The Specific Political Expression Alleged by Plaintiffs Cannot Form the Basis of a Hostile Environment Claim**

Title VI does not and cannot require that universities punish and censor protected political speech. *See StandWithUs*, 158 F.4th at 13-14 *citing Texas v. Johnson*, 491 U.S. at 412 ("Using Title VI to compel adherence to a preferred

---

[9] *See, e.g.,* Emily Scolnick, *Pro-Palestinian Supporters Rally Against War in Gaza as Penn Investigates Graffiti Along March Route*, THE DAILY PENNSYLVANIAN (Dec. 3, 2023), https://www.thedp.com/article/2023/12/penn-protest-rally-palestine-gaza-uc-townhomes; Briana Smith, *Pro-Palestinian Protestors Hold Passover Seders at University of Pennsylvania, Swarthmore College*, 6ABC (Apr. 28, 2024), https://6abc.com/post/pro-palestinian-protesters-hold-passover-seders-at-university-of-pennsylvania-swarthmore-college-amid-encampments/14741226/; Eva Andersen and Casey Kuhn, *Passover Seder Held Near Protest Encampment at the University of Pennsylvania*, CBS NEWS (Apr. 29, 2024), https://www.cbsnews.com/philadelphia/news/protest-at-penn-philadelphia-seder-passover/.

political viewpoint would also implicate students' First Amendment freedoms. A law punishing private citizens for expressing political opinions disfavored by Congress would be subject to 'the most exacting' First Amendment scrutiny."). Simply put, Title VI does not offer some exceptional pathway to violate the First Amendment. Private universities have the right to allow their students to protest genocide, use slogans that call for equal rights, screen documentaries critical of specific ideologies—and advocate for and against war, armed resistance, and ceasefires in university spaces and on social media. *See, e.g.*, *StandWithUs*, 158 F.4th at 13 ("'private schools,' in particular, 'have a First Amendment right to academic freedom'" and to "encourage, rather than suppress, a vigorous exchange of ideas.").

Thus, contrary to Plaintiffs' imagination, this Court has no choice but to "reach, on this record, the interplay between the First Amendment, Title VI, and private universities." Pls.' Br. at 48-49. As described in the Statement of Interest above, Amici are intimately familiar with the escalating efforts of individuals and groups to position Title VI and Title VII to sit somehow outside the constitutional constraints of the First Amendment. As a result, courts have increasingly had to address the limitations that the First Amendment necessarily places on federal anti-

discrimination laws.[10] Several courts have answered the question as this Court should, by recognizing that the kind of pro-Palestinian speech that is challenged here—even where it offends—is protected political speech not actionable under Title VI.[11]

The First Circuit's recent analysis in *StandWithUs v. MIT* is instructive. In a similar Title VI case alleging a hostile environment at the Massachusetts Institute of

---

[10] *See* Darryl Li, *The Rising Threat of Antisemitism Investigations,* LAW AND POLITICAL ECONOMY PROJECT (Sep. 30, 2025), https://lpeproject.org/blog/the-rising-threat-of-antisemitism-investigations/;
Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 HARV.L.REV.1 (2025); Evelyn Douek & Genevieve Lakier, *Title VI as a Jawbone*, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY (Sep. 26, 2024), https://knightcolumbia.org/blog/title-vi-as-a-jawbone; Alex Kane, *The Civil Rights Law Shutting Down Pro-Palestine Speech*, JEWISH CURRENTS (Nov. 15, 2024), https://jewishcurrents.org/civil-rights-law-pro-palestine-speech-israel-trump; Alex Gourevitch, *The Right to Be Hostile*, BOSTON REVIEW (July 22, 2025), https://www.bostonreview.net/forum/the-right-to-be-hostile/.

[11] The Department of Education Office for Civil Rights (OCR), which enforces Title VI, has long recognized that "to be prohibited by the statutes within OCR's jurisdiction, [harassment] must include something beyond the mere expression of views, words, symbols that some person finds offensive." Gerald A. Reynolds, Asst. Sec'y, U.S. Dep't of Educ. Off. for C.R., *First Amendment: Dear Colleague [OCR-00028]* (July 28, 2003), https://www.ed.gov/about/offices/list/ocr/firstamend.html. Title VI protects students from "prohibited discrimination" and does not "restrict the exercise of expressive activities or speech that are protected under the First Amendment," which is "particularly relevant in the university environment, where academic freedom fosters the robust exchange of ideas." Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ., to Robert J. Birgeneau, Off. of Chancellor, Univ. of Cal. Berkeley (Aug. 19, 2013), https://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR_.pdf.

Technology (MIT), the court found as a threshold matter that "most of the conduct about which plaintiffs complain is speech protected by the First Amendment, and [the court does] not construe Title VI as requiring a university to quash protected speech." *StandWithUs*, 158 F. 4th at 11-12. Many of the slogans, protests, and other pro-Palestinian speech activity alleged to violate Title VI in *StandWithUs* are identical or strikingly similar to the allegations here. *Id*. at 5-10. The First Circuit also noted that allegations that protesters who "gather[ed] together in groups on campus, disrupt[ed] campus tranquility, and imped[ed] travel…did not render their speech antisemitic, much less unprotected" and that "speech made in public that is related to matters of public concern has been given 'special protection under the First Amendment' and thus 'cannot be restricted simply because it is upsetting or arouses contempt.'" *Id.* at 12 (quoting *Snyder v. Phelps*, 562 U.S. 443, 458 (2011)).

District courts have come to the same conclusion. In *Landau v. Corporation of Haverford College*, 780 F. Supp. 3d 548, 555 (E.D. Pa. 2025), the court described pro-Palestinian student expression as a "classic example of protected First Amendment expression," refuting allegation that kuffiyehs, which it described as "attire that signified [] support for Palestinians," created a hostile antisemitic environment, and instead describing kuffiyehs as a "classic example of First Amendment expression." In *Newman*, 2022 U.S. Dist. LEXIS at *71, 77, 80 n. 16, the court concluded that finding pro-Palestinian advocacy, including advocating

14

anti-Israel or militant views, supporting boycotts of Israel, criticizing Israel's settlements in the West Bank, and criticizing the Israeli government's actions as a basis for a hostile environment claim would "invalidate … an entire academic and public debate." It found that ("[d]espite the sensitive and important [] issues these conflicting viewpoints and actions raise, as an overarching matter, such debates…have been recognized to fall within First Amendment protections.").[12] *Newman*, 2022 U.S. Dist. LEXIS 60722, at *78-79. In *Gartenberg*, the court found that "many of the alleged instances of harassment detailed in the [] Complaint are examples of pure speech on matters of public concern," including a sidewalk demonstration, chanting slogans, distributing flyers and an art display with the words "RESIST COLONALISM FROM THE BRONX TO PALESTINE 'BY ANY MEANS NECESSARY.'" 765 F. Supp. 3d at 270-71. *Gartenberg* concluded that Title VI cannot allow for liability based on such speech "that is reasonably designed or intended to contribute to debate on matters of public concern, and that is expressed through generally accepted methods of communication." *Id.* at 66.

The principle that speech protected by the First Amendment cannot constitute actionable harassment under federal civil rights laws is a longstanding one. *See, Felber v. Yudof*, 851 F. Supp. 2d 1182, 1184-85, 1188 (N.D. Cal. 2011) (analyzing

---

[12] Citing Timothy Cuffman, *The State Power to Boycott a Boycott: The Thorny Constitutionality of State Anti-BDS Laws*, 57 COLUM. J. TRANSNAT'L 115, 138 (2018).

Title VI claims and finding that "a very substantial portion of the conduct" alleged, which included student signs alleged to criticize Israel and support Hamas, "represents pure political speech and expressive conduct" that is "entitled to special protection under the First Amendment."). *See also, Rodriguez v. Maricopa Community College*, 605 F.3d 703, 705-710 (9th Cir. 2009) (finding that hostile environment allegations of "racially-charged emails" by a professor on a college listserv and on a college district-hosted website was "pure speech; they were the effective equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot.").

This case is governed by the same principle. The bulk of allegations on pages 62 through 134 in the Amended Complaint, which Plaintiffs reference on pages 7-16 of their Appeal, are pure political speech or expression on a matter of public concern. As the court in *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 2025 U.S. Dist. LEXIS 33977, at *11-12 (S.D.N.Y. Feb. 25, 2025) ("*Gartenberg II*") aptly put it:

> …[T]he First Amendment cannot be evaded through the motte-and-bailey routine of professing to concede that "Title VI does not compel a school to restrict speech" while attempting to redefine virtually all forms of contentious political expression—from a sidewalk protest and leafletting to a disagreeable speech by a college professor—as "harassment" that colleges must address on pain of civil liability. It is therefore no answer to say that the First Amendment concern in avoiding government censorship of campus speech dissipates merely by virtue of broadly characterizing offensive speech on sensitive issues as "harassment" or "discrimination." *Saxe v. State Coll. Area Sch. Dist.*,

240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.) ("There is no categorical harassment exception to the First Amendment's free speech clause") (internal citations removed).

**C. The Antisemitism Definition Advocated for by Plaintiffs Violates the First Amendment**

Plaintiffs ask the court to use the IHRA definition of antisemitism and its contemporary examples to summarily find that any expression which "blam[es] Israel," applies "double-standards" to Israel, "draw[s] comparisons of contemporary Israeli policy to that of the Nazis," "den[ies] the Jewish people their right to self-determination," or "denies Israel the right to exist" creates a hostile environment for Jewish students. JA49-51 ¶¶ 25-27. This is contrary to the First Amendment, and this Court should explicitly say so in its opinion, as the First Circuit did in *StandWithUs*, 158 F.4th at 16-17 (noting the "absence of consensus reflecting ongoing debate as to the relationship between anti-Zionism and antisemitism -- debate that our constitutional scheme resolves through discourse, not judicial fiat.").

While the presence of Palestinians and those who believe Palestinians deserve equal rights may be discomforting for some students, that does not make such expression actionable under Title VI. For example, many white parents who supported segregation were discomforted—even frightened—by the prospect of Black children attending schools with their children. But advocacy for the rights of Black Americans to live as equal citizens was not anti-white any more than advocacy

17

for the equal rights of Palestinians is anti-Jewish. In fact, it is opposition to equal rights of Black people that is discriminatory, just as opposition to equal rights for Palestinians is discriminatory. The Penn students advocating against the oppression of Palestinians include Jewish students, just as the Americans opposed to segregation included white Americans.

The First Amendment protects the right to criticize governments and there can be no special carve-out for speech critical of Israel.

## II. The Particular Slogans and Protests Plaintiffs Challenge Reflect Political Commitments Rooted in Principles of Justice and Struggle, Not Anti-Jewish Animus

Plaintiffs' appellate brief attempts to evade First Amendment scrutiny by mischaracterizing pro-Palestinian speech and expression as "harassing conduct" and "fighting words" where "context is key," thereby suggesting that such expression falls outside the realm of the First Amendment. Pls.' Br. at 46-7. To begin, numerous courts have rejected this attempted characterization of nearly identical terms, concluding they are entitled to First Amendment protection. *See supra* Part I.A-B. Amici nevertheless clarify the meaning of commonly invoked slogans, words, and protest tactics in order to assist the Court in evaluating this expression from the perspective of supporters of Palestinian rights, including Palestinians themselves.[13]

---

[13] In *Segev*, *supra,* No. 1:25-cv-12020 ECF No. 35, the court found that when assessing the use of "certain rhetoric . . . The relevant question is whether the protestors chanting these slogans viewed them as antisemitic."

### A. Slogans Speaking Favorably of "Intifada" are Protected Political Speech

Etymologically, the term "intifada" refers to a literal "shaking off."[14] The term is widely used in Arabic to refer to popular uprisings around the world and carries a specific connotation of asymmetry in power rather than a battle between two equally-resourced parties.[15] For example, the term *intifada* has been used to refer to uprisings in other parts of the world outside of Palestine, including Western Sahara[16] and Iraq,[17] as well as the Arab Spring Uprisings against authoritarianism and for democracy. Palestinians use this word to refer to periods of collective uprising in

---

[14] Mikaela Bell and Alice Zanini, *The Origins and Meaning of Intifada*, NATAKALLAM, https://natakallam.com/blog/meaning-of-intifada/ (last visited Oct. 1, 2025).

[15] Corey Robin, *What Do We Talk About When We Talk About "Globalize the Intifada?"* COREY ROBIN (June 30, 2025), https://coreyrobin.com/2025/06/30/what-do-we-talk-about-when-we-talk-about-globalize-the-intifada.

[16] Elliana Bisgaard-Church, *Sahrawis Campaign for Human Rights and Independence in the First Intifada, Western Sahara, 1999-2004*, GLOBAL NONVIOLENT ACTION DATABASE (Nov. 20, 2011), https://nvdatabase.swarthmore.edu/content/sahrawis-campaign-human-rights-and-independence-first-intifada-western-sahara-1999-2004.

[17] Abdulwahab Al-Qassab, *Iraq's Southern Intifada: Mere Demands or a Popular Revolution?*, ARAB CENTER WASHINGTON DC (July 25, 2018), https://arabcenterdc.org/resource/iraqs-southern-intifada-mere-demands-or-a-popular-revolution/.

their decades-long struggle against colonization, and it has more recently been used as a call for global opposition to injustice.[18]

While for some the word evokes images of violence, "the fact that some will hear a call for 'intifada' as urging the murder of Israeli Jews . . . [does not] entail[] that protestors who hew to the 'intifada' chant are making that choice to provoke, insult or threaten their Jewish (or even Israeli) peers." Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 HARV. L. REV. F. 1, 18 (2025). Indeed, as Eidelson and Hellman underscore the term, "I stand with the IDF" is correspondingly highly offensive to some Palestinian students, who may reasonably hear that as a justification for atrocities against them.

Throughout history, political slogans have been interpreted as being a call for justice, or alternatively an attack on the oppressor group, including, "Immediate Emancipation!," "End Segregation Now," "Jim Crow Must Go," "By Any Means Necessary," "Black Lives Matter," "No Justice, No Peace," and "End Apartheid Now." That some students view political slogans challenging government policies as threatening does not make such slogans actionable harassment under Title VI. *See Gartenberg*, 765 F. Supp. 3d at 271 ("Regardless of whether this expression is better characterized as righteous protest in support of a noble cause, as the vulgar

---

[18]     Yousef Munayyer, *Zohran Mamdani Shows Democrats How Not to Take the Bait*, THE INTERCEPT (July 10, 2025), https://theintercept.com/2025/07/10/mamdani-globalize-intifada-democrats/.

celebration of terrorism and antisemitism, or as something in-between, it is not a proper basis on which to impose civil liability on Cooper Union."). Under Plaintiffs' theory of liability, students would not be able to speak out against state-sanctioned slavery, segregation, or apartheid.

### B. "From the River to the Sea" is Protected Political Speech

Plaintiffs find hurtful and actionable the expression "From the River to the Sea, Palestine Will be Free." Yet, Palestinians and their allies use the phrase to express an aspiration for freedom across the entirety of historic Palestine—the land between the Jordan River and the Mediterranean Sea. Supporters of Israel, including Prime Minister Benjamin Netanyahu's Likud Party, have also used "From the River to the Sea," as a slogan calling for Israeli sovereignty between the Jordan and the Mediterranean.[19] Jewish students around the country have likewise used the slogan to express support for Palestinian freedom.[20]

---

[19] Jonathan Ofir, *If You're Surprised by Netanyahu's 'River to the Sea' Comment, You Haven't Been Paying Attention,* MONDOWEISS (Jan. 19, 2024), https://mondoweiss.net/2024/01/if-youre-surprised-by-netanyahus-river-to-the-sea-comment-you-havent-been-paying-attention/; Jewish Virtual Library, *Likud Party: Original Party Platform*, THE JEWISH VIRTUAL LIBRARY (last visited Sept. 30, 2025), https://www.jewishvirtuallibrary.org/original-party-platform-of-the-likud-party.

[20] *See, e.g.*, Bi-Co Jewish Voice for Peace (@bicojvp), INSTAGRAM, https://www.instagram.com/p/CzHmCruJsJ1/ (Nov. 1, 2023); Ariel Yu and Daksha Pillai, *Hundreds of Affiliates Participate in National Walkout with Students for Justice in Palestine and Jewish Voice for Peace*, COLUMBIA SPECTATOR (Oct. 25, 2023), https://www.columbiaspectator.com/news/2023/10/26/hundreds-of-

Courts have specifically held that such an expression is constitutionally protected even if controversial, provocative, or unsettling to some. *See, e.g.*, *StandWithUs*, 158 F.4th at 19 ("Rather, plaintiffs say that we should construe chants of 'from the river to the sea, Palestine will be free' and 'intifada revolution' as calls to wipe out the Jewish people as such. But neither slogan says as much on its face, nor do plaintiffs allege facts suggesting that either chant was commonly so construed by the protestors."); *Univ. of Md. Students for Just. in Palestine*, 2024 U.S. Dist. LEXIS 178359, at *22 (D. Md. Oct. 1, 2024) (holding that "From the river to the sea" is protected by the First Amendment); *Segev*, No. 1:25-cv-12020, ECF No. 35.

Indeed, the slogan addresses one of the most contested issues in modern international politics—whether the land between the Jordan and the Mediterranean should be a state equally for all its people, a state with full rights for Jews and limited rights for Palestinians, or something completely different. In so addressing a "matter[] of public concern," the phrase "occupies the highest rung of the hierarchy of First Amendment values" *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quotation marks and internal citations omitted)).

---

affiliates-participate-in-national-walkout-with-students-for-justice-in-palestine-and-jewish-voice-for-peace/.

## C. Slogans with the word "Martyr" and/or Expressing Favor for Hamas are Protected Speech

Slogans of praise such as "glorious martyrs" are likewise political speech protected under the First Amendment. In Islam, the idea of martyrdom is not simply synonymous with sacrifices in battle, but rather "encompasses a broader spectrum of sacrifices made in pursuit of justice and righteousness."[21] A martyr encompasses everyone "[f]rom doctors refusing to abandon their patients in bombed hospitals to rescue workers searching tirelessly beneath the rubble…."[22] The conflation of the term "martyr" or "shaheed" with a glorification of violence is frequently used to censor Palestinians and Arabic-speakers who speak out against Israel's killing of Palestinians. For example, the Oversight Board—which hears appeals of censorship decisions on Facebook, Instagram, or Threads—ultimately agreed with public comments expressing concern that Meta's blanket ban on the term "shaheed" both greatly suppressed free expression in a disproportionate way and that it was unduly broad.[23]

---

[21] Stephanie B., Diala B., and Sarah T., *Martyrdom in Palestine and Islam*, PALESTINE DIASPORA MOVEMENT (Jan. 6, 2025), https://www.palestinediasporamovement.com/newsletter/martyrdom-in-palestine-and-islam.

[22] *Id.*; Plaintiffs also admit that protestors hosted a "full day" of programming to "honor [of] martyred [Palestinian] media workers" (JA114 ¶ 209), showing that "martyr" is a broad term used to honor those who died in the pursuit of justice.

[23] Public Comment Appendix for PAO 2023-01, OVERSIGHT BOARD, https://www.oversightboard.com/wp-content/uploads/2025/12/3522468194685859.pdf (last visited Dec. 22, 2025).

Moreover, the Supreme Court has long held that the First Amendment protects deeply offensive political ideas—including abstract advocacy of violence as a mean to effect political change—unless it is directed at and likely to produce imminent lawless action. *See generally Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Yates v. United States*, 354 U.S. 298 (1957). Accordingly, expressing an opinion in favor of Hamas is still protected expression, which federal courts opining on this matter have found. *See, e.g.*, *Univ. of Md. Students for Just. in Palestine*, 2024 U.S. Dist. LEXIS 178359, at *22 (holding that references to "Hamas fighters as patriots, martyrs, or freedom fighters" is protected by the First Amendment); *Felber*, 851 F. Supp. 2d at 1188 (holding that plaintiffs "appear to be attempting to draw an untenable line that would remove from protection signs and publications that are critical of Israel and supportive of Hamas and Hezbollah").

### D. "Free Palestine," "Free Gaza," and Cursing the Israeli Army Is Protected Political Speech

The phrases "Free Palestine" or "Free Gaza" and statements like "Fuck the IDF," which express a negative view of Israel's military force, are protected political statements and do not target any student on the basis of a protected group, any more than the slogan of "Free Tibet" targets Chinese students, "Free Kashmir" targets Indian students, or "End the Genocide in Rwanda" targets Hutu students.

Speaking out against the Israeli military is a matter of public concern and, as the court noted in *Landau*, "reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views." 780 F. Supp. 3d at 555; *see also Cohen v. California*, 403 U.S. 15, 16, 25–26 (1971) ("holding that the message "Fuck the Draft" on a jacket was protected speech and that the government may not suppress expression simply because it is offensive). Indeed, many Israelis and Jews are highly critical of Israel's genocide in Gaza.[24]

**E. The Freedom School for Palestine Is Protected Political Speech**

Plaintiffs likewise complain of a three-week sit-in dubbed "The Freedom School for Palestine" because they allege it featured "anti-Israel banners on the walls" and people "express[ing] their hatred for Israel" on bullhorns. Pls.' Br. at 32-33. Yet all that Plaintiffs complain of represents core protected speech. *See Snyder*, 562 U.S. at 453.

Plaintiffs claim that people who were unaffiliated with Penn "were invited to espouse antisemitic views" during the Freedom School. JA113 ¶ 206. However, they

---

[24]     *See*, *e.g.*, Aaron Boxerman, *In a First, Leading Israeli Rights Groups Accuse Israel of Gaza Genocide*, N.Y. TIMES (July 28, 2025), https://www.nytimes.com/2025/07/28/world/middleeast/israel-genocide-gaza-rights-groups.html; Omer Bartov, *I'm a Genocide Scholar. I Know it When I See It.*, N.Y. TIMES (July 15, 2025), https://www.nytimes.com/2025/07/15/opinion/israel-gaza-holocaust-genocide-palestinians.html.

do not provide any examples of what was said, and it is not enough to make conclusory statements that certain conduct or speech is antisemitic. *StandWithUs*, 158 F.4th at 18 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009) ("Here, plaintiffs proffer only conclusory allegations of antisemitic animus that are 'not entitled to be assumed true.'")).

Plaintiffs' allegations relating to the Freedom School for Palestine concern expression which does not target students on the basis of a protected characteristic, and the First Amendment therefore bars treating such speech as actionable under Title VI. *See Snyder*, 562 U.S. at 458.

### III. Plaintiffs' Demands of the University Potentially Create a Hostile Environment for Palestinian Students in Violation of Title VI

Plaintiffs claim that Penn should have done a number of things in response to the above-described pro-Palestinian speech activity on its campus. (Pls.' Br. at 7-16.) They specifically wanted Penn to "distance itself from" a festival celebrating Palestinian literature and culture (*Id*. at 7), discipline those who participated in a protest that expressed criticism of Israel (*Id*. at 14), stop a pro-Palestinian rally where students criticized Israel and also discipline the student group that dared to host such an event (*Id*. at 15), and prevent anyone who supported a Palestinian literary festival from being on Penn's Presidential Commission on Countering Hate and Building Community (*Id*. at 16).

Yet had Penn taken the measures Plaintiffs propose, it would have risked violating the Title VI rights of Palestinians on campus. Plaintiffs' insistence that Penn should have cancelled a Palestinian literature festival because they felt unsafe and scared by the prospect of hundreds of Palestinians arriving on campus is revealing. Should Penn have violated its own policies on freedom of expression and cancelled the festival based on gross anti-Arab and/or Islamophobic stereotypes that the presence of Palestinians puts Jewish students at risk of physical harm, Penn would most certainly be liable under Title VI for directly discriminating against Palestinian students and students associating with Palestinians.

The same is true for the other measures Plaintiffs claim Penn should have taken: engaging in such censorship and punishment would mean that Palestinian students would be the only national origin or racial group summarily barred from criticizing the state that oppresses them.

Plaintiffs' demands only reveal their impermissibly one-sided view of the First Amendment. Contrary to Plaintiffs' solipsistic demand, the First Amendment cannot preference their preferred worldview; the First Amendment protects all viewpoints and nothing in Title VI permits an exception to this profound constitutional commitment.

## CONCLUSION

For the foregoing reasons the Court should affirm the decision below.

Dated: December 22, 2025

Respectfully submitted,

*/s/Maria C. LaHood*
Maria C. LaHood
Baher Azmy
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
mlahood@ccrjustice.org
(212) 614-6464

Radhika Sainath
Sabiya Ahamed
PALESTINE LEGAL
55 Exchange Place
New York, NY 10005
(917) 200-2190

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of Amici Curiae complies with the type-volume limitation of Rule 29(5) the Federal Rules of Appellate Procedure because it contains 6,364 words exclusive of those items excluded from length limits.

Dated: December 22, 2025

/s/Maria C. LaHood
Maria C. LaHood

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 22, 2025.


Dated: December 22, 2025                    */s/Maria C. LaHood*
                                            Maria C. LaHood