# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2239

EYAL YAKOBY, JORDAN DAVIS, NOAH RUBIN and
STUDENTS AGAINST ANTISEMITISM, INC.,

*Plaintiffs-Appellants,*

*v.*

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

*Defendant-Appellee.*

On Appeal from an Order of the United States District Court
for the Eastern District of Pennsylvania in Case No. 23-cv-04789
Honorable Mitchell S. Goldberg

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

Marc E. Kasowitz
Andrew L. Schwartz
Amit R. Vora
Andrew C. Bernstein
Jillian R. Roffer
KASOWITZ LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ...........................................................................1

ARGUMENT...................................................................................3

I.    PLAINTIFFS STATED THEIR TITLE VI CLAIM. ...................................3

      A.    Plaintiffs Adequately Pleaded Deliberate Indifference.........................3

            1.    The Court Misapplied the Deliberate-Indifference Standard. ...4

            2.    The Court Misapplied the Rule 12(b)(6) Standard....................5

            3.    Plaintiffs Adequately Pleaded Actual Knowledge.....................10

      B.    Plaintiffs Adequately Pleaded Severe and Pervasive Antisemitic
            Harassment Creating an Unlawfully Hostile Environment................14

      C.    The First Amendment Does Not Avail Penn. .................................. 20

      D.    The Court Erred in Denying Injunctive Relief. .................................25

II.   PLAINTIFFS STATED THEIR STATE-LAW CLAIMS. ......................25

      A.    Plaintiffs Adequately Pleaded a Breach-of-Contract Claim................25

      B.    Plaintiffs Adequately Pleaded a UTPCPL Claim.............................27

III.  THE DISTRICT COURT ABUSED ITS DISCRETION IN STRIKING
      THE PLEADING.................................................................. 28

CONCLUSION.................................................................................30

COMBINED CERTIFICATIONS..................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.J.T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279*,
605 U.S. 335 (2025) ..................................................................................4

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014) ....................................................................10

*Bostic v. Smyrna Sch. Dist.*,
418 F.3d 355 (3d Cir. 2005) ..............................................................10, 13

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ................................................................5, 6

*Canaan v. Carnegie Mellon Univ.*,
760 F. Supp. 3d 306 (W.D. Pa. 2024) ....................................................18

*Castleberry v. STI Grp.*,
863 F.3d 259 (3d Cir. 2017) ....................................................................18

*Commonwealth by Shapiro v. UPMC*,
208 A.3d 898 (Pa. 2019) ..........................................................................27

*Danganan v. Guardian Prot. Servs.*,
813 F. App'x 769 (3d Cir. 2020) .............................................................27

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ........................................................................5, 6, 18

*Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018) ....................................................................15

*Doe v. Manor Coll.*,
479 F. Supp. 3d 151 (E.D. Pa. 2020) ......................................................10

*Doe v. Univ. of Scis.*,
961 F.3d 203 (3d Cir. 2020) ....................................................................26

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*,
　765 F. Supp. 3d 245 (S.D.N.Y. 2025) ........................................................18, 19

*Healy v. James*,
　408 U.S. 169 (1972).................................................................................. 21

*Hickey v. Univ. of Pittsburgh*,
　81 F.4th 301 (3d Cir. 2023) ...............................................................6, 10, 27

*Kestenbaum v. President & Fellows of Harvard Coll.*,
　743 F. Supp. 3d 297 (D. Mass. 2024) ..............................................................25

*Landau v. Corp. of Haverford Coll.*,
　780 F. Supp. 3d 548 (E.D. Pa. 2025) ..............................................................14

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
　594 U.S. 180 (2021) .................................................................................. 21

*Manhattan Cmty. Access Corp. v. Halleck*,
　587 U.S. 802 (2019) ..................................................................................20

*Mediacom Se. LLC v. BellSouth Telecomms., Inc.*,
　672 F.3d 396 (6th Cir. 2012) .......................................................................5

*Oncale v. Sundowner Offshore Servs., Inc.*,
　523 U.S. 75 (1998)............................................................... 18, 20, 22, 24

*Patane v. Clark*,
　508 F.3d 106 (2d Cir. 2007) ....................................................................... 19

*Phillips v. Cnty. of Allegheny*,
　515 F.3d 224 (3d Cir. 2008).......................................................................14

*In re Ross*,
　858 F.3d 779 (3d Cir. 2017) .......................................................................28

*Saxe v. State Coll. Area Sch. Dist.*,
　240 F.3d 200 (3d Cir. 2001)....................................................................... 19

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*,
　729 F.3d 248 (3d Cir. 2013).......................................................................10

*Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
  158 F.4th 1 (1st Cir. 2025) ................................................................ 3, 23, 24

*T.B. v. New Kensington-Arnold Sch. Dist.*,
  2016 WL 6879569 (W.D. Pa. Nov. 22, 2016) ..................................... 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ........................................................................... 21

*Vurimindi v. Fuqua Sch. of Bus.*,
  435 F. App'x 129 (3d Cir. 2011) ................................................... 25, 26

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ........................................................................... 21

*Wisconsin v. Mitchell*,
  508 U.S. 476 (1993) ........................................................................... 21

## Constitutional Provision, Statutes, and Rules

U.S. Const. amend. I ...................................................................... *passim*

42 U.S.C. § 2000d ........................................................................ *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................... 1, 5, 10

Fed. R. Civ. P. 12(f) ........................................................................... 28

73 Pa. Stat. Ann. § 201-1 ............................................................ 27, 28

## Other Authorities

*Racial Incidents and Harassment Against Students at Educational
  Institutions: Investigative Guidance*, 59 Fed. Reg. 11448 (1994) ........... 19

U.S. Dep't of Educ., Off. for Civ. Rights, *Dear Colleague Letter: Title
  VI and Shared Ancestry or Ethnic Characteristics Discrimination*
  (May 7, 2024) .................................................................................. 21

David E. Bernstein, *Title VI Hostile Environment Law in the Shadow of Antisemitic Violence*, Journal of Free Speech Law (forthcoming 2026) ............................................................................................ 23, 24

Stephen E. Sachs, *Zionism and Title VI*, 139 Harv. L. Rev. F. 50 (2025). ........................................................................................... 23

**INTRODUCTION**

Penn's brief embraces the district court's central error. According to Penn, this Court should affirm because, as "Penn argued below" and as "the [district] court *credited* in its opinion," Penn's responses to acts of antisemitism on its campus "defeat any claim of deliberate indifference." (Penn Br. 26-27 (emphasis added).) That formulation is revealing. At the pleading stage, a court must credit the plaintiff's well-pleaded allegations—not the defendant's self-serving account. Like the district court, Penn has inverted the Rule 12(b)(6) lens.

Viewed in Plaintiffs' favor, the pleading alleges that Penn's responses to known acts of antisemitic harassment were woefully inadequate. Penn belatedly issued hollow statements after serious antisemitic incidents; repeatedly declined to enforce campus rules in the face of illicit antisemitic rallies and building takeovers that sabotaged Plaintiffs' opportunity to learn (the point of university); decided not to activate its emergency notification system to alert anyone about a bomb threat against Hillel; convened performative committees; and refused to implement proportionate security or disciplinary measures. In other words, Penn pantomimed action: through meaningless gestures, it tried to create the impression that it was confronting antisemitism so that it could evade meaningful responses. These allegations raise classic factual disputes—what Penn knew, what it did, whether its

1

responses were adequate—that a court may not resolve on a motion to dismiss by "credit[ing]" Penn's contrary version of events.

Penn also presses a divide-and-conquer theory of hostile environment, arguing that because no single Plaintiff's experiences, viewed in isolation, were sufficiently severe or pervasive, the Title VI claim fails. But the suggestion that Plaintiffs did not suffer enough antisemitic harassment should send a chill down the spine of prospective and current students. Rallygoers called Davis a "dirty little Jew," told her that she "deserve[d] to die," and warned her and her Jewish friends to "get out of here kikes." (A.102.¶.176.) Yakoby received personal death threats, such as "die Zionists pig," which made him fear for his safety. (A.136-37.¶.270.) Rubin, "[f]ollowing the demonstrations and mobs rampaging campus," "could not sleep for over two weeks." (A.138.¶.272.) Both Yakoby and Rubin were inside Hillel when Penn decided not to alert anyone, including them, of the bomb threat (A.111.¶.200), and they were directed to "step out" from Houston Hall's occupied Reading Room for the offense of being Jewish (A.114.¶.208).

In any event, a Title VI claim's hostile-environment element turns on the totality of the circumstances and the reasonable student's perspective. Plaintiffs alleged not only individualized harassment and threats, but also campus-wide rallies, takeovers, and disruptions that extinguished their educational opportunities. This

constellation of conduct created an objectively hostile educational environment—as Plaintiffs will establish if this case is reinstated. So contrary to Penn's insistence that the hostile-environment element is an alternative basis for affirmance, it is thoroughly fact bound and ill suited for dismissal at the pleading stage.

Nor does the First Amendment supply Penn a pleading-stage escape hatch. Plaintiffs alleged numerous incidents of antisemitic conduct and categorically unprotected speech, such as fighting words. Consistent with the First Amendment, moreover, the Title VI inquiry may consider violent rhetoric where, as here, it contributes to a hostile educational environment under the totality-of-circumstances framework. The First Circuit's contrary instinct in *Stand With Us*—treating genocidal slogans (e.g., "globalize the intifada") as off limits rather than as contextual evidence of hostility—flouts that principle. This Court should reverse.

## ARGUMENT

## I. PLAINTIFFS STATED THEIR TITLE VI CLAIM.

### A. Plaintiffs Adequately Pleaded Deliberate Indifference.

Despite the district court's holding that Plaintiffs "failed to plead any *facts* showing … deliberate indifference on the part of *Penn*" (A.13), facts about Penn's deliberate indifference are precisely what Plaintiffs alleged. The amended complaint cannot fairly be read otherwise, particularly at the pleading stage, and Penn's brief does nothing to move the needle on this point.

### 1.    The Court Misapplied the Deliberate-Indifference Standard.

Penn fails to justify the district court's remark that it "could find no allegations that Penn or its administration has itself taken any actions or positions which[,] even when read in the most favorable light, could be interpreted as antisemitic with the intention of causing harm to the Plaintiffs." (A.13.) If that statement reflects the court's conception of the deliberate-indifference standard, this Court should reverse. For a defendant to be deliberately indifferent, it need not have taken an affirmative act or position with discriminatory animus or intent to cause harm. (Pls.' Br. 23-24.) Were there any doubt about this proposition, *A.J.T.* dispelled it—precedent that Penn overlooks. *A.J.T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 344-45 (2025) ("That standard does not require a showing of personal ill will or animosity toward the [plaintiff].") (citation modified).

Nor does Penn defend the district court's presumption that *a* response is an *adequate* response. The court observed: "[T]he Amended Complaint acknowledges that Penn *has* responded to the antisemitic incidents and expressions of antisemitism on its campus and has made efforts to redress these problems." (A.13.) The court's emphasis that Penn "*has* responded," coupled with its rote references to particular efforts without analysis, exposes the court's mistaken premise that responding alone, no matter the response's contours, is enough to satisfy Title VI.

### 2.    The Court Misapplied the Rule 12(b)(6) Standard.

Penn also has no answer to Plaintiffs' argument that the district court turned Rule 12(b)(6) on its head, viewing the facts in the light most favorable to Penn, the Rule 12(b)(6) movant, rather than to Plaintiffs, the Rule 12(b)(6) non-movant. (Pls.' Br. 26-27, 37-38 (collecting authorities).) Indeed, Penn doubles down. It urges this Court to affirm because, as "Penn argued below" and as "the court *credited* in its opinion," Penn's efforts "defeat any claim of deliberate indifference." (Penn Br. 26-27 (emphasis added).) At "the pleading stage," however, the court's task is to "credit plaintiffs' allegations rather than defendants' responses." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997); *see also Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) ("The district court's construction of [Rule] 12(b)(6)—crediting the defendant's, rather than the plaintiff's version of facts—unduly raises the pleading standard beyond the heightened level of *Iqbal* and *Twombly*, forcing the plaintiff's well-pleaded facts to be not only plausible, but persuasive.").

To be sure, *Davis* noted in passing that a court may, when appropriate, resolve a deliberate-indifference claim on a motion to dismiss. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999). But that observation is tempered by *Davis*'s ruling, which was to reverse the complaint's Rule 12(b)(6) dismissal. *Id.* at 654. In so ruling,

5

*Davis* cited the very principle that this Court applied in *Hickey* and *Burlington*—and the principle that should control here: "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (citation omitted); *accord Hickey v. Univ. of Pittsburgh*, 81 F.4th 301, 308 (3d Cir. 2023) (citing *Burlington*, 114 F.3d at 1420).

More specifically, while Penn congratulates itself for "repeatedly" and "unequivocally" issuing statements that "affirmed its 'moral responsibility' to combat antisemitism" (Penn Br. 26), Plaintiffs' pleading showed why Penn's platitudes were inadequate to discharge its Title VI duties. Penn waited for more than a week to issue its September 22, 2023, statement acknowledging antisemitic incidents at Meyerson Hall and Hillel (A.86.¶.121); and three days later, Chabad was defaced with graffiti (A.87.¶.124). President Magill waited until October 18 to issue her "Message to the Penn Community," but by then, the campus had been thrice engulfed with antisemitic rallies celebrating the October 7 attack (A.105.¶.185); and two days later, a Jewish fraternity house was targeted with antisemitic vandalism (A.106.¶.188). Five days after that, another antisemitic rally took over Penn's campus (A.106-07.¶.189); and three days after that, yet another antisemitic rally took over Penn's campus—where, this time, a Penn student felt emboldened enough to praise the October 7 terrorist attack as "glorious" and "joyful" (A.107.¶.190).

Likewise, while Penn says that "Penn Police immediately responded to conduct that violated Penn's policies or the law," and that Penn "took remedial measures" when "perpetrators could be identified" (Penn Br. 26), Plaintiffs' pleading showed the opposite. The student who celebrated October 7 went on to steal an Israeli flag from the home of Jewish students—for which she was arrested and charged. (A.107.¶.191.) A month later, she was back in class. (A.107.¶.191.) In fact, as Plaintiffs will prove if this case is restored, Penn imposed on her a meager probation-level sanction of "Suspension Not Imposed," along with a reflective-essay assignment. (A.501.) Another Penn student who stole an Israeli flag from a private residence in a separate November 16 incident similarly received a "Suspension Not Imposed." (A.502.)

Nor did Penn summon anything resembling a reasonable response to the antisemitic building takeovers and campus rallies. On the night of November 14, although Penn Police initially instructed the Freedom School to leave Houston Hall's Reading Room, Penn Police abruptly changed course and let the group remain overnight. (A.113.¶.205.) That botched reaction fueled what came next: the occupants overtook the Reading Room for over three weeks, transforming it into an antisemitic war room. (A.114.¶.209.) Penn Police and Penn administrators did nothing to stop it, despite multiple safety complaints from Plaintiffs and other Jewish

students whose freedom to access a campus space and study in peace was vitiated, and despite the obvious violations of campus rules and trespass law. (A.114.¶.209.) And as Plaintiffs would prove on remand, sixteen students who participated in the takeover received no discipline. (A.504.) Meanwhile, at least five antisemitic rallies swept the campus, including a rally on December 3 where Penn Police and Penn administrators stood idly by as a mob of one-hundred marched, vandalized campus property, and chanted for the genocide of Jews. (A.116.¶.214.)

Penn's revisionist account of its Action Plan is similarly unavailing. Although Penn claims that the Action Plan "resulted in a significant increase in security across campus" (Penn Br. 12) and "concrete actions" (Penn Br. 27-28), these assertions are conclusory and—as Plaintiffs' lived experience reveals—false. On November 5, five days after Penn announced the Action Plan—which provided for "reviews," "discussions," and "conversations" (A.108-09.¶¶.195-96)—Penn received emails threatening violence against the Jewish community, specifically naming Hillel (a Jewish community center for students) and Lauder College House (a dorm where Jewish students reside) (A.111.¶.200). Penn responded with deliberate indifference: it declined to activate its emergency notification system to warn anyone, including Yakoby and Rubin, who were at Hillel. (A.111.¶¶.200-01.) Nine days later, antisemitic protestors occupied Houston Hall. (A.112-13.¶.204.)

8

The Student Advisory Group, Task Force, and Presidential Commission were equally ineffective. Rubin, a member of the Student Advisory Group, explained that its administrators "lacked any interest in his urgent and serious security concerns." (A.123-24.¶.237.) The Task Force's chair admitted that "massive" differences of opinion had gridlocked its operations, reducing it to a body that could offer "listening sessions." (A.110.¶.199.) The Commission's staff included a professor who claimed that Penn does not have antisemitism issues and at least two Palestine Writes supporters (A.81.¶.105; 123.¶.235)—and on the heels of the Commission's creation, the Freedom School occupied Van Pelt Library (A.124-25.¶.239), and another antisemitic rally seized the campus (A.125-26.¶¶.242-43).

Given the wealth of factual detail in Plaintiffs' pleading, there was no basis for the district court to hold that Penn's responses, as alleged, were "*legally* sufficient to refute any inference of deliberate indifference," as Penn itself describes the holding. (Penn Br. 24 (emphasis added).) The question whether Penn's responses were clearly unreasonable under Title VI encompasses a host of subsidiary questions, including whether Penn's statements and committees were performative, why Penn chose not to activate its emergency notification system for the bomb threat against Hillel and Lauder College House, and whether "Penn Police immediately responded to conduct that violated Penn's policies or the law" (Penn Br. 26). Such

9

issues are plainly factual disputes that cannot be resolved at the pleading stage—and that certainly cannot be viewed in a light favoring the defendant. Because the court "credit[ed]" Penn's version of the disputed facts—again, to borrow Penn's own description of what the court did (Penn Br. 26-27)—the court squarely violated Rule 12(b)(6), warranting reversal. *See Hickey*, 81 F.4th at 308; *Doe v. Manor Coll.*, 479 F. Supp. 3d 151, 162 (E.D. Pa. 2020) ("Courts look to the totality of the circumstances when determining deliberate indifference, and deliberate indifference will often be a fact-based question, for which bright line rules are ill-suited.") (citation modified); (Pls.' Br. 26-27, 37-38 (collecting authorities)).

### 3.    Plaintiffs Adequately Pleaded Actual Knowledge.

The district court did not address "actual knowledge," which is a prerequisite for deliberate indifference. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272-73 (3d Cir. 2014) ("to establish deliberate indifference, a plaintiff must show that the school district had knowledge of the alleged misconduct") (citation modified); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 265 (3d Cir. 2013) ("knowledge that a federally protected right is substantially likely to be violated"); *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005) ("An educational institution has 'actual knowledge' if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger.")

(citation omitted). In Penn's telling on appeal, Plaintiffs failed to plead that Penn knew about "many" of the alleged antisemitic incidents. (Penn Br. 38.) But on closer examination, Penn is referring to a few incidents, and Penn again is asking this Court to improperly credit its version of disputed facts on a motion to dismiss.

To illustrate, Penn urges that Davis did not plead Penn's knowledge about the despicable harassment she endured during the antisemitic rally on October 16 (Penn Br. 39), where she was told that she was a "dirty little Jew" and "deserve[d] to die" (A.102.¶.176). But she alleged: "[W]hile Open Expression Observers were present, they did nothing to protect [her]." (A.102.¶.176.) Viewed in the most favorable light to her, that allegation—especially the statement that "they did nothing to protect [her]"—pleads that Penn's Open Expression Observers witnessed her harassment. Davis also reported the assault to Chabad Rabbi Levin and anonymously through Penn's Bias Incident Reporting System (A.103.¶.180)—which, combined with accommodations she requested from her professor, her academic advisor, and the Weingarten Center due to the assault (A.102-03.¶.177; 104.¶.183), strengthens the inference that appropriate persons at Penn knew. Only a cramped, Penn-centric construction of the pleading—to which Penn claims entitlement—could support Penn's assertion that Davis did not plausibly allege knowledge.

Equally deficient is Penn's attempt to downplay Yakoby and Rubin's

allegations that Reading Room occupants directed them to "step out." (A.114.¶.208.) While Penn contends that these allegations are insufficient to plead knowledge because Plaintiffs did not allege that "anyone at Penn was on notice of who told [them] to 'step out,' or whether their motivation was antisemitic" (Penn Br. 39), or that "Penn had information to identify the individuals" (Penn Br. 40), that contention is absurd. Yakoby was known on campus for his Jewish and Israeli advocacy; Rubin was wearing a yarmulke; and Plaintiffs' pleading is replete with allegations that the Reading Room occupation was steeped in antisemitism. (A.112-14.¶¶.204-09.) Plaintiffs also specified the administrators they notified and when: "Rubin later reported this incident on December 4 and 18, 2023, to administrators, including [Vice Provost] Kozuma and [Chaplain and Vice President] Howard … as well as members of the Antisemitism Task Force." (A.113-14.¶¶.206-09.)

Even more baffling is Penn's argument that Plaintiffs did not plead Penn's knowledge about the antisemitic harassment that Yakoby suffered on October 16. While Yakoby was putting up posters of Israeli hostages, a man threateningly approached him and yelled "fuck you." (A.99-100.¶.168.) As Plaintiffs alleged: "Yakoby immediately reported the incident to the first Penn Police officer he could find." (A.99-100.¶.168.) As Plaintiffs further alleged: "Yakoby wrote to President Magill, Vice Provost Kozuma, and Director Wigginton to again warn them of the

12

dire situation on campus," specifically re-reporting the antisemitic incident involving the posters. (A.103.¶.178.) For Penn, though, Yakoby still had somehow failed to put Penn on notice of the antisemitic harassment: "Telling someone 'fuck you' is not antisemitic just because the recipient is Jewish." (Penn Br. 38.) But to make its bizarre point, Penn brushes aside half the fact pattern: Yakoby was assaulted while *putting up posters of Israeli hostages*. Only construing the pleading in Penn's favor could permit the inference that this incident was not antisemitic.

More fundamentally, neither Title VI's text nor Title VI precedent burdens victims with a duty to investigate and identify their harassers. Rather, Title VI places responsibility on institutions to protect victims from harassment when appropriate persons have actual knowledge about the "underlying facts." *See Bostic*, 418 F.3d at 361; *see also T.B. v. New Kensington-Arnold Sch. Dist.*, 2016 WL 6879569, at *6 (W.D. Pa. Nov. 22, 2016) ("The institution must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.") (citation modified). Here, Plaintiffs' allegations show that Penn knew more than enough about the underlying facts—including antisemitic rallies and takeovers threatening Plaintiffs' physical safety, impeding their freedom to move on campus, and hindering their ability to learn—and that its responses were clearly unreasonable.

13

In addition, whether Penn knew enough, and did enough, are disputed factual matters that cannot be resolved in Penn's favor at this stage. On remand, Plaintiffs would prove that Penn knew about the antisemitic assaults on Davis and Yakoby, the antisemitic acts against Yakoby and Rubin in the Reading Room, and myriad other antisemitic incidents—yet chose not to take meaningful action. For now, reversal is warranted because Plaintiffs alleged "enough facts to raise a reasonable expectation that discovery [would] reveal evidence of the necessary element," *see Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (citation modified).

In this vein, Penn misplaces its reliance on *Landau*. There, "[o]f the 430 paragraphs in the Complaint, only twice [did] Plaintiffs plead that someone put administrators on notice of allegedly discriminatory conduct." *Landau v. Corp. of Haverford Coll.*, 780 F. Supp. 3d 548, 560 (E.D. Pa. 2025). Here, Plaintiffs' notice allegations are legion. (*E.g.*, A.97.¶.159; 98.¶.162 (alleging that Yakoby presented "detailed information concerning the virulent antisemitism spreading across campus"); 103.¶.178; 114.¶.208; 124.¶.238.)

## B.   Plaintiffs Adequately Pleaded Severe and Pervasive Antisemitic Harassment Creating an Unlawfully Hostile Environment.

This Court should decline Penn's invitation to affirm on the alternative basis that Plaintiffs did not plausibly allege their Title VI claim's hostile-environment element. In essence, Penn adopts a divide-and-conquer approach, urging that

14

because each Plaintiff did not suffer severe or pervasive antisemitic harassment on his or her own, no Plaintiff can plead that Penn's educational environment was unlawfully hostile to Jewish and Israeli students. (Penn Br. 43-44.) But that argument trivializes Plaintiffs' suffering and fails three times over.

*First*, even when "isolated" (Penn Br. 44), each Plaintiff's allegations about his or her own experience readily plead severe *and* pervasive antisemitic harassment. *Cf. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 n.99 (3d Cir. 2018) (requiring a severe-*or*-pervasive showing). When Davis passed rallygoers, they called her a "dirty little Jew," told her that she "deserve[d] to die," and warned her and her Jewish friends to "get out of here kikes." (A.102.¶.176.) She spent the next day hiding in her room and missed every class that week except one. (A.103.¶.179.) Later, although the Reading Room was a regular study location for her, she was "forced to avoid the building throughout finals" when the Freedom School turned it into an antisemitic war room. (A.114.¶.208.) She was also forced to flee Van Pelt Library when the Freedom School descended there. (A.124-25.¶.239.) On several occasions, rallygoers' genocidal chants of "intifada" made her afraid to leave her room (A.117.¶.216), and when she encountered them while walking across campus, she diverted her path out of fear, making her late to class (A.125-26.¶.243). Overall:

> She has been assaulted, mocked, abused, harassed, intimidated, and demonized, solely because she is Jewish and supports her ancestral

15

> homeland and the people who live there. She is terrified not only for her physical safety and indeed for her life, but also for what will happen to her if she dares to speak out about the antisemitism she must constantly confront on campus. She has spent parts of her freshman fall semester cowering in her dorm room rather than having to contend with rampaging mobs echoing the cries of terrorists to slaughter Jews and eradicate the world's only Jewish country.

(A.137-38.¶.271; *see also* A.380-82.)

Yakoby endured individualized, severe, and pervasive antisemitic harassment, as well. He was not only assaulted while putting up Israeli hostage posters, but he received personal death threats, such as "die Zionists pig," which caused him to "live in fear for his safety." (A.136-37.¶.270.) The antisemitic rallies and takeovers caused him to hide in his room and miss classes. (A.117.¶.216; 136-37.¶.270.) So too with Rubin. (A.117.¶.216; 138-39.¶.272.) "Following the demonstrations and mobs rampaging campus, [he] could not sleep for over two weeks." (A.138.¶.272.) An antisemitic mob forced him to miss work for a final project in a Penn engineering lab, which led to his first-ever grade of incomplete. (A.116.¶.214; 138.¶.272.)

Both Yakoby and Rubin were also personally turned away from the occupied Reading Room because they are Jewish. (A.114.¶.208.) And they were both in Hillel when they saw police and bomb-sniffing dogs enter the building; Yakoby contacted Director Wiggington, who waffled but—after Yakoby pressed her—admitted that someone had sent a bomb threat. (A.111.¶.200.) As they later learned, Penn had

received antisemitic emails threatening violence against the Jewish community, specifically naming Hillel and Lauder College House—yet Penn did not activate its emergency notification system to warn anyone. (A.111.¶¶.200-01.) Davis learned of the bomb threat the next day when a friend, who worked at Hillel, warned her not to visit; she avoided Hillel in the coming weeks. (A.111.¶.200.)

The SAA Plaintiffs, too, endured personal acts of antisemitic harassment that were objectively severe and pervasive. SAA Member #1's professor harassed her, including by leading a classroom discussion about "Jews exaggerat[ing] terrorist attacks to justify their colonial and racist desires." (A.72-73.¶.89.) She reported the incident to the department head, who did nothing. (A.73.¶.90.) The unceasing classroom harassment, along with the antisemitic campus atmosphere, made her fear "physical or verbal assault." (A.139.¶.273.) The antisemitic rallies, takeovers, and other disruptions also destroyed SAA Member #2's ability to focus or function— especially because Penn administrators failed to warn students about them. (A.139.¶.274.) "President Magill's testimony during the Antisemitism Hearing constantly replay[ed] in [his] head, as [did a student's] praising the murder of Jews and the fact that she is still a student on campus." (A.139.¶.274.)

For Penn to insist that what Plaintiffs personally endured was neither severe nor pervasive enough to "plausibly" affect their education (Penn Br. 44) should

strike fear into the hearts of those who seek to enroll there. When students receive personal death threats based on their Jewish or Israeli identity, they have objectively suffered a quantum of harassment that concerns Title VI—even if Penn is unmoved. *See Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017) ("an isolated incident of discrimination (if severe) can suffice to state a claim for harassment"); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 272 (S.D.N.Y. 2025) ("Title VI places responsibility on colleges and universities to protect their Jewish students from harassment, not on those students to hide themselves away in a proverbial attic or attempt to escape from a place they have a right to be").

*Second*, Penn's hostile-environment test is wrong. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (citation omitted); *see also Davis*, 526 U.S. at 631 ("harassment depends on a constellation of surrounding circumstances, expectations, and relationships"); *Castleberry*, 863 F.3d at 264 ("[w]hether an environment is hostile requires looking at the totality of the circumstances"); *Canaan v. Carnegie Mellon Univ.*, 760 F. Supp. 3d 306, 329 (W.D. Pa. 2024) ("Context is especially important here where the 'totality of the circumstances' is the relevant framework for establishing a Title VI hostile educational environment

18

claim.") (citing *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001)). Under that settled principle, antisemitic acts affecting Jewish and Israeli students across Penn's campus are relevant to Plaintiffs' Title VI claim. *See Racial Incidents and Harassment Against Students at Educational Institutions: Investigative Guidance*, 59 Fed. Reg. 11448 (1994) ("racial acts need not be targeted at the complainant in order to create a racially hostile environment"); (Pls.' Br. 45-46 (collecting authorities)). So even though Plaintiffs were not dining at Goldie, a nearby Israeli-owned restaurant, when the December 3 mob attacked it, the incident deeply troubled them and is part of the context. (A.116-17.¶¶.215-16.) The Rittenhouse Rally, where a speaker saluted Hamas for a "job well done," is similarly part of the constellation. (A.90.¶.135.) There is no authority for Penn's proffered proposition that the aggregate is irrelevant, or that collective experiences matter only if individual experiences reach Penn's preferred threshold. (Penn Br. 43 n.3, 44.)

*Third*, "[d]etermining whether conduct is severe or pervasive enough to create a hostile environment involves a question of fact and is generally inappropriate to determine at the pleadings stage of a litigation." *Gartenberg*, 765 F. Supp. 3d at 270 (citation modified) (citing *Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007)). Absent crediting Penn's version of disputed facts, Plaintiffs have sufficiently alleged a hostile environment to proceed beyond the pleadings to proof.

## C.    The First Amendment Does Not Avail Penn.

"[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019). Penn, a private entity, tries to skirt this proposition through the constitutional-doubt canon, urging that "Title VI cannot be construed to require private universities to do what the First Amendment prohibits Congress from doing directly." (Penn Br. 33-34.) Although Penn's hypothesis is an open question in this Circuit, this Court need not resolve it, because even if the First Amendment applies in this way, it does not shield Penn from Title VI liability. Penn's proposal fails on its own terms.

Penn and its amici disregard that Plaintiffs alleged numerous incidents of antisemitic conduct and categorically unprotected speech. (Pls.' Br. 46-49.) Worse still, Penn and its amici miss that the rallygoers' antisemitic chanting and other such speech is relevant to Plaintiffs' Title VI claim, and contributed to the hostile educational environment, because the Title VI inquiry hinges on the totality of the circumstances. *See, e.g.*, *Oncale*, 523 U.S. at 81. The First Amendment does not mandate otherwise—as the Office for Civil Rights has explained in guidance that Penn ignores: "[T]hat harassment may involve conduct that includes speech in a public setting or speech that is also motivated by political or religious beliefs … does

20

not relieve a school of its obligation to respond under Title VI … if the harassment creates a hostile environment in school for a student or students." U.S. Dep't of Educ., Off. for Civ. Rights, *Dear Colleague Letter: Title VI and Shared Ancestry or Ethnic Characteristics Discrimination* (May 7, 2024).

This view of the interaction between Title VI and speech harmonizes with longstanding First Amendment doctrine. A court may consider even protected speech as contextual evidence of motive. *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). And a university may restrict even political speech on its campus if it causes "substantial disruption" to or a "material interference" in a student's educational experience. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 514 (1969); *accord Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 188 (2021). That is because a university has "special characteristics": in a house of learning, "[a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Healy v. James*, 408 U.S. 169, 189 (1972). Put differently, since a "university's mission is education," it retains "authority to impose regulations compatible with that mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981).

Under these established principles, slogans such as "there is only one

solution: intifada revolution" (A.44.¶.8) may factor into the Title VI hostile-environment analysis, consistent with the First Amendment, because such speech is key to the context. From a reasonable Jewish student's perspective, when fellow students and faculty chant such slogans—while forming a mob that blocks the student's path to class; or while trespassing, vandalizing, and occupying a reading room and thereby making it impossible for the student to study there; or while otherwise committing conduct that violates campus rules and the law and that thereby deprives the student of educational opportunities—those slogans are part of the constellation of circumstances that renders the educational environment objectively hostile. (*E.g.*, A.58.¶.46 (identifying Penn campus rules prohibiting individuals and groups from: "caus[ing] injury to persons or property or threaten to cause such injury"; "interfer[ing] unreasonably with the activities of other persons"; and "knowingly interfering with unimpeded movement in a University location").) Indeed, the speech amplifies the conduct's discriminatory content, centering it in the crosshairs of Title VI's anti-discrimination command. (Pls.' Br. 10-11 (explaining the genocidal meaning of the "intifada" and "river to the sea" slogans).) And when the slogans accompany discriminatory assaults—as here—the slogans become all the more objectively threatening, and all the more pertinent to the Title VI analysis. *See, e.g.*, *Oncale*, 523 U.S. at 81.

As Professor Bernstein puts the point: "Violent anti-Israel rhetoric on many campuses has been accompanied by illicit conduct beyond protected speech, such as unlawful building takeovers, threats, vandalism, harassment, and demonstrations in violation of time-, place-, and manner restrictions. These actions make violent-sounding rhetoric salient to hostile-environment claims." David E. Bernstein, *Title VI Hostile Environment Law in the Shadow of Antisemitic Violence*, Journal of Free Speech Law (forthcoming 2026), at 29.[1]

Professor Sachs concurs: "[I]n the totality of the circumstances on campus, including repeated and consequence-free violations of campus rules, could these slogans not contribute to a hostile environment? Of course they could—and may well have." Stephen E. Sachs, *Zionism and Title VI*, 139 Harv. L. Rev. F. 50, 72 (2025).

While the First Circuit has opposed that position in *Stand With Us*, a Title VI campus-antisemitism action against MIT, its decision is erroneous, and Penn's First Amendment analysis is weaker for relying on it. *Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1 (1st Cir. 2025). There, the First Circuit found that encampment-participants' chants such as "globalize the intifada" amounted to protected political speech, reasoned that the plaintiff-students' allegations about

---

[1] https://ssrn.com/abstract=6029555.

such speech could not support their Title VI claim under the First Amendment, and affirmed the action's dismissal. *Id.* at 19-20, 27. But in so holding, the court defied *Oncale*'s directive to judge harassment "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" 523 U.S. at 81 (citation omitted). The court instead determined, at the pleading stage, that encampment-participants could not have subjectively intended their chants as genocidal, and the court brushed aside allegations that antisemitic conduct, alongside antisemitic speech, had created an objectively hostile educational environment where Jewish students reasonably feared antisemitic violence. *See* 158 F.4th at 19-21; *see also* Bernstein, *supra*, at 9-10 (criticizing the decision). This Court should not follow the First Circuit's flawed approach.

Penn is also wrong to suggest that Plaintiffs, by alleging violent rhetoric in their Title VI claim, are advocating unconstitutional speech restrictions. (Penn Br. 33.) Rather, Plaintiffs argue that Penn violated Title VI because it failed to respond to known acts of antisemitism with adequate remedies, such as stronger and swifter security reforms (unlike Penn's response to the Hillel bomb threat), and sterner disciplinary measures for illicit conduct (unlike Penn's response to the Reading Room takeover). Further, for injunctive relief, Plaintiffs request "necessary and appropriate" actions—not unconstitutional speech restrictions. (A.149-50.)

### D.     The Court Erred in Denying Injunctive Relief.

Penn argues that the district court deemed damages an "adequate remedy" (Penn Br. 46), but Penn rewrites the opinion. The court, rather than evaluating whether damages were adequate, presumed that Plaintiffs' request for damages disqualified them from injunctive relief (A.14)—which is incorrect (Pls.' Br 49-50). And as Plaintiffs demonstrated, injunctive relief is necessary because damages are inadequate to remedy the ongoing, imminent, and irreparable harm from Penn's continued refusal to counteract antisemitic harassment; and compelling Penn to take necessary and appropriate action, and to enforce its policies in a non-discriminatory manner, neither prejudices it nor disserves the public interest.[2] (Dkt. 42 at 31-39; Pls.' Br. 49-50; A.149-50, 381-82, 393-95, 501-04.) *See also Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 312 n.7 (D. Mass. 2024).

## II.     PLAINTIFFS STATED THEIR STATE-LAW CLAIMS.

### A.     Plaintiffs Adequately Pleaded a Breach-of-Contract Claim.

Penn seeks refuge in *Vurimindi* (Penn Br. 49-51), but that case undermines Penn's position. *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011) (per curiam). The plaintiff-student there brought a breach-of-contract action alleging

---

[2] As Plaintiffs would show on remand, Davis, Rubin, and one SAA member are current students at Penn.

that Duke, through its policies, had promised him a harassment-free education, but he failed to "point to any specific and definite terms." *Id.* Quite the contrary, he pointed to policies describing Duke's desire to afford him "the highest quality education" and assuring him that Duke "appreciates and values differences." *Id.* And the "general anti-harassment policy that [the plaintiff] described did no more than present Duke's view that harassment is unacceptable because it is inconsistent with its stated commitment to excellence." *Id.*

Here, however, Plaintiffs identified fourteen provisions, across seven policies, containing specific and definite terms giving rise to Penn's contractual promises; and Plaintiffs detailed how Penn violated those promises. (Pls.' Br. 52 & n.2.) For example, the Code of Student Conduct prohibits "threats of physical violence," "disorderly conduct," "hate speech," "epithets," and "racial, ethnic, sexual and religious slurs." (A.56-57.¶¶.42-43; 145.¶.298.) And Penn's Charter of the Student Disciplinary System states that Penn will "provid[e] a fair and effective mechanism for investigating and resolving … alleged violations by students of the University's rules, regulations, and policies." (A.61.¶.56.) Such provisions cannot fairly be construed as "merely express[ing] institutional values and behavioral expectations of community members." (Penn Br. 49.) That describes Duke's aspirational policies in *Vurimindi*—not Penn's policies, which "evidence[] care in [their] preparation,"

26

indicating that the "words were employed deliberately." *See Doe v. Univ. of Scis.*, 961 F.3d 203, 212 (3d Cir. 2020) (citation modified). Because Plaintiffs' breach-of-contract claim rests on specific and definite policies rather than bromides, it should have survived. *See Hickey*, 81 F.4th at 317; *cf. Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 910 (Pa. 2019) (holding that pleading-stage demurrer may be sustained only if defendant's interpretation is unambiguously correct).

### B.   Plaintiffs Adequately Pleaded a UTPCPL Claim.

Penn fares no better in relying on *Danganan* (Penn Br. 53), where the plaintiff brought a UTPCPL claim against a home-security company for continuing to bill him after he moved and sold his home. *Danganan v. Guardian Prot. Servs.*, 813 F. App'x 769, 772 (3d Cir. 2020). His claim was doomed from the start: the contract unambiguously stated that his obligations would continue even if he moved and sold his home. *Id.* at 773. But here, unambiguous contractual language does not foreclose Plaintiffs' UTPCPL claim. And contrary to Penn's argument that Plaintiffs did not explain how Penn's policies were deceptive or how their reliance was justifiable (Penn Br. 53-54), Plaintiffs did just that. As alleged and argued, Penn had disseminated specific, detailed, and clear anti-discrimination and anti-harassment policies, on which Rubin and Davis justifiably relied because they had seen Penn enforcing those policies. Penn, however, deceived them: despite its past practice,

27

Penn failed to enforce its policies to protect Rubin, Davis, and other Jewish students, thereby harming them and violating the UTPCPL. (Pls.' Br. 53-54.) There is thus no merit to Penn's thesis that the district court properly decided this well-pleaded and fact-intensive claim for Penn as a matter of law on a motion to dismiss. (Penn Br. 55.)

## III.  THE DISTRICT COURT ABUSED ITS DISCRETION IN STRIKING THE PLEADING.

Penn devotes the bulk of its brief on this issue to contesting Plaintiffs' reading of the district court's strike order. (Penn Br. 55-57.) The upshot: the parties agree that an order to strike the pleading is an abuse of discretion. (Pls.' Br. 55-57.)

If this Court reads the strike order as limited to granting Penn's motion to strike, the order should still be vacated, as it has no reasoning. *See In re Ross*, 858 F.3d 779, 786 (3d Cir. 2017). Substantiating a strike order is important because it is a "drastic remedy." (Pls.' Br. 55-56 (collecting authorities).) Yet neither the court nor Penn has explained how Plaintiffs' request for "necessary and appropriate remedial and preventive measures" (A.149-50) contained "redundant, immaterial, impertinent or scandalous" material, Fed. R. Civ. P. 12(f). Penn also obscures the difference between (i) Plaintiffs' request for "necessary and appropriate" measures and (ii) a request for specific disciplinary actions against particular persons, which Plaintiffs did not request. (A.149-50.) That portion of the strike order should be vacated because it targets non-existent material.

28

* * *

Penn's musing that Plaintiffs should have waited to bring this action is profoundly misguided. (Penn Br. 2-3.) A discrimination victim need not wait and see if the misconduct will cease, and Plaintiffs are entitled to relief including damages for Penn's misconduct through March 2024, when they filed their amended complaint.

On remand, moreover, Plaintiffs would adduce evidence supporting their allegations and confirming their need for relief. After this action's filing, violent antisemitic incidents continued unabated, and Penn continued not to meaningfully respond. (A.381-82, 393-95, 501-04.) The action's dismissal against the backdrop of escalating yet unremedied antisemitic violence prompted Plaintiffs to stand on their pleading and appeal. If the district court, upon examining Plaintiffs' extensive factual allegations, could still conclude that Plaintiffs had pleaded no facts whatsoever about Penn's deliberate indifference, then nothing could have convinced the court, no matter what Plaintiffs alleged or how much the situation worsened. Reversing the court's dismissal now—and correcting the court's underlying substantive and procedural misapprehensions—is the only way to protect Plaintiffs and other Jewish and Israeli students from harm and to hold Penn accountable for its misconduct.

29

## CONCLUSION

This Court should reverse the judgment of dismissal, vacate the order to strike, and remand for further proceedings.

Dated: January 14, 2026

                                        Respectfully submitted,


                                        By:    */s/ Marc E. Kasowitz*

                                        Marc E. Kasowitz
                                        NY Bar No. 1309871
                                        Andrew L. Schwartz
                                        NY Bar No. 5224712
                                        Amit R. Vora
                                        NY Bar No. 4894713
                                        Andrew C. Bernstein
                                        NY Bar No. 5572870
                                        Jillian R. Roffer
                                        NY Bar No. 5696992
                                        **KASOWITZ LLP**
                                        1633 Broadway
                                        Tel.: (212) 506-1700
                                        New York, NY 10019
                                        mkasowitz@kasowitz.com
                                        aschwartz@kasowitz.com
                                        avora@kasowitz.com
                                        abernstein@kasowitz.com
                                        jroffer@kasowitz.com

                                        *Counsel for Plaintiffs-Appellants*

## COMBINED CERTIFICATIONS

1.    <u>Bar Membership</u>: Under Local Rule 28.3(d), Marc E. Kasowitz, Andrew L. Schwartz, Amit R. Vora, Andrew C. Bernstein, and Jillian R. Roffer are members of the bar of the U.S. Courts of Appeals for the Third Circuit.

2.    <u>Word Count</u>: This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,499 words.

3.    <u>Typeface</u>: This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in size 14-pt Equity A.

4.    <u>Identical Briefs</u>: Under Local Rule 31.1(c), counsel certifies that the text of the electronic brief and the text of the hardcopy brief are identical.

5.    <u>Virus Scan</u>: Under Local Rule 31.1(c), counsel certifies that a virus scan was run on the brief's electronic copy using Vipre Virus Protection 3.1

6.    <u>Service</u>: On January 14, 2026, this brief was served through the Court's CM/ECF system on counsel for all parties to be served. Defendant's

counsel of record is a Filing User and is served electronically by the Notice of

Docket Activity.

/s/ *Marc E. Kasowitz*